IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LIONEL HATHAWAY, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>COMMISSIONER OF SOCIAL )<br>SECURITY, )<br>)<br>Defendant. ) | Case No.  3:04-cv-453-DGW |

**ORDER**

This matter is before the Court pursuant to Local Rule 9.1, regarding the disposition of Social Security cases in this District.  Lionel Hathaway ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act, as amended 42 U.S.C. 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act.  For the reasons set forth below, the final decision of the Commissioner of Social Security denying benefits is **AFFIRMED**.  The case is **DISMISSED** with prejudice.

**BACKGROUND**

**Administrative Proceedings**

The plaintiff filed an application for DIB on November 13, 1990, alleging that he became unable to work on March 29, 1990 (Tr. 92-93).  On August 1, 1991, he filed an application for SSI (Tr. 88-91).  The Social Security Administration ("SSA") denied his claim initially, on reconsideration, and by decision of an Administrative Law Judge (ALJ) (Tr. 95-98,100-102, 824-839).  The Appeals Council remanded and ordered assignment to a different ALJ, ordering that the ALJ to consider several medical opinions and provide good reasons for the weight given

1

to these opinions (Tr. 850-853). A second hearing was held on June 20, 1995 (Tr. 26-87). On July 28, 1995, the ALJ again denied plaintiff's claims and denied benefits (Tr. 11-25). The Appeals Council declined review (T 8-10). Plaintiff's insured status for disability benefits lapsed during these proceedings on June 30, 1993 (Tr. 985).[1]

Plaintiff then filed Case No. 97-4260-JPG in the United States District Court for the Southern District of Illinois. By stipulation of the parties the case was remanded back to the SSA for further proceedings (Tr. 1031-1032). The Appeals Council then remanded the case to a third ALJ to evaluate the reports of Dr. Froehling, Dr. Amble and Dr. May (Tr. 1033). By decision dated October 22, 2001, the third ALJ found that the Plaintiff was not disabled as of his alleged onset date because based upon his residual functional capacity ("RFC") he could perform a significant number of jobs in the economy and therefore was not entitled to DIB. However, the ALJ awarded plaintiff SSI benefits commencing on his 55th birthday, January 14, 1997 because the Medical-Vocational Guidelines ("Grid") directed such a finding of disability (Tr. 973-986). On May 4, 2004, the Appeals Council declined review of the ALJ's decision, making that decision the final decision of the Commissioner (Tr 963-966). 20 C.F.R. §§ 404.955, 404.981. This Court has jurisdiction to review under 42 U.S.C. § 405(g).

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1) The claimant has not engaged in substantial gainful employment since January 14, 1997.
> (2) The medical evidence establishes that the claimant has the following severe impairments: personality disorder, diabetes mellitus with

---

[1] The issue before the Court is whether the Plaintiff became disabled before June 30, 1993, the date he was last insured and eligible for DIB.

      neuropathy and retinopathy, osteoarthritis of the left shoulder, bilateral knees and right hand, and degenerative disease.
(3) The claimant has no impairment that meets or equals the criteria of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.
(4) The claimant's assertions concerning his ability to work are not credible.
(5) The claimant retains the residual function capacity to perform a limited range of light unskilled work.
(7) As of his alleged onset date of August 25, 1990, the claimant was initially a younger individual and at age 50 was approaching advanced age with a limited education and a semi-skilled work background with no transferable skills.
(8) Based upon the vocational expert testimony, considering age, education, and work experience and additional limitations, there were a significant number of jobs he could perform in the regional economy.
(9) The claimant was not disabled prior to January 14, 1997, when he reached the age of 55 and was considered of advanced age under Social Security regulations.
(10) Based upon an exertional capacity for light work, and the claimant's age, education, and work experience, a finding of disabled is directed by medical-vocational rule 202.06, effective January 14, 1997.
(11) The claimant has been under a disability, as defined in the Social Security Act, since January 14, 1997, but not prior thereto.
(12) Because the claimant did not establish disability prior to his date last insured of June 30, 1993, he is not entitled to a period of disability of Disability Insurance Benefits.

(Tr. 985).

   The only issue before the Court is whether the final decision of the Commissioner is supported by substantial evidence.

**Statement of Facts**

   Plaintiff was 48 years old at the time of his application, 51 at the time his DIB insured status expired, and 55 on January 14, 1997 (Tr. 35). He completed ninth grade and has training and past work experience as a Certified Nurses Assistant (CNA) (Tr. 41-42, 117,121). Plaintiff claimed he was disabled due to back problems, nerve damage in his left leg, and anger problems (Tr. 28, 992). Plaintiff claimed that he injured his back in March 1990 and had difficulty with his back since that time (Tr. 135). With respect to his diabetes, Plaintiff indicated

3

that he could not feel his legs at times, and that he had diabetic retinopathy, and could hardly see (Tr. 997-99). Plaintiff also indicated that he became angry and wanted to strike out, and therefore, had to be by himself (Tr. 994). He indicated that his anger management problems had never led to encounters with the criminal justice system (Tr. 998). He also stated that the woman that he lived with had not felt in danger from his behavior (Tr. 998-99).

Plaintiff had a history of diabetes since about 1985 (Tr. 161, 746). He also had a history of a pain syndrome in his left shoulder (Tr. 657). A bone scan from December 1987 showed arthritic changes of the left shoulder joint and mild arthritic changes of both knees (Tr. 664). As of March 1990, Plaintiff's diabetes was treated with oral agents (Tr. 156). On March 25, 1990, Plaintiff was hospitalized for pain in his back, which radiated down his left leg (Tr. 155). He indicated that he had been making his rounds as a CNA when he suddenly had a lightening-like pain down his left leg and into his foot, followed by back pain (Tr. 156). Lumbosacral spine x-rays were negative (Tr. 157). Plaintiff was diagnosed with an herniated nucleus pulposus with left lumbar radiculopathy (Tr. 154-55). Subsequently, in June 1990, Plaintiff was referred to Alan Froehling, M.D., an orthopaedic surgeon (Tr. 176, 178). On June 26, 1990, Plaintiff was admitted to the hospital for his continued low back and left leg pain (Tr. 178). Plaintiff had reduced motion of the lumbar spine, and positive straight leg raising on the left (Tr. 179). His sensory examination was abnormal on the left, and he had considerable give-way weakness in all muscle groups of the left leg (Tr. 181). Dr. Froehling reported that the protein in Plaintiff's spinal fluid was elevated, as was his glucose level, and that these findings were consistent with diabetic involvement of the spinal nerves (Tr. 178). A myelogram and CT scan showed mild degenerative joint disease with minimal central posterior bulging at the L-4 and L-5 discs, but no

4

disc herniation (Tr. 178, 183, 187). It was thought that Plaintiff probably had a mixture of mechanical low back pain and diabetic neuropathy (Tr. 178).  On June 30, 1990, William Huffstutler, M.D., performed a consultative examination of Plaintiff (Tr. 371-78).  Dr. Huffstutler's impression was a mechanical back syndrome and secondary problems including diabetic peripheral neuropathy and diabetic amyopathy (Tr. 375).  On September 9, 1990, Dr. Froehling indicated that an EMG was consistent with peripheral neuropathy, which was consistent with diabetes (Tr. 248, 369).  Dr. Froehling sent Plaintiff to Worklab Industrial Rehabilitation (Worklab) for a physical capacity evaluation (Tr. 248).

On October 9, 1990, Worklab performed an evaluation of Plaintiff (Tr. 190-98).  The examination was conducted by Randall Brown, M.S., the program director, and Sydelle Mitchell, M.S., a psychometrist (Tr. 198).  A Psycho-Social Assessment was performed as part of the testing, in which it was noted that Plaintiff appeared to be unmotivated to return to his prior employment (Tr. 193). The report indicated that an MMPI-2 test showed that Plaintiff did not suffer from any psychosocial stressors (Tr. 193). Plaintiff's physical functioning was rated as light (Tr. 197). He was able to lift 20 pounds from the floor to waist height, and 15 pounds from knuckle to overhead height (Tr.196-97).  Plaintiff had difficulty with both sitting and standing activities and his tolerance appeared to be only for approximately 10 to 15 minute time intervals (Tr. 197).  On October 22, 1990, Dr. Froehling opined that it would be dangerous for Plaintiff to try and lift more than 15 pounds on a regular basis (Tr. 248).

On January 21, 1991, Worklab completed a second evaluation of Plaintiff (Tr. 236-42). On this occasion, the evaluation was completed by Virgil May, III. Rh.D., a clinical rehabilitation evaluator (Tr. 242).  Dr. May determined that Plaintiff was capable of lifting 10

pounds, sitting for six hours in an eight-hour workday, standing for one hour in an eight-hour workday, and walking for one hour with intermittent breaks in an eight-hour workday (Tr. 241). Further, he opined that Plaintiff's bending, stooping, kneeling, carrying, pushing/pulling, and climbing were restricted (Tr 241).  Dr. May concluded that Plaintiff was permanently and totally disabled from work (Tr. 242).  On January 24, 1991, Dr. Froehling opined that Plaintiff's pain interfered with his ability to work a full workday (Tr. 247). He noted that Plaintiff showed continued flexion intolerance, and his reflex remained absent at the ankles (Tr. 247). In March 1991, Dr. Froehling noted that Plaintiff could not lift more than 10 pounds (Tr. 247).  He referred Plaintiff to see Dr. May for further vocational counseling (Tr. 247).

On July 1, 1991, Dr. Froehling wrote a letter indicating that Plaintiff was unable to lift more than 10 to 15 pounds at a time, he had significant pain that precluded him from working an eight hour day, and his prognosis for recovery was slim (Tr. 350). In 1992, Dr. Froehling reported that Plaintiff continued to limp and drag his left leg somewhat (Tr. 357). Dr. Froehling opined that Plaintiff was not employable and that he would be seeing Dr. May again for a followup (Tr. 357).

On March 10, 1992, Dr. May wrote a letter to Dr. Froehling indicating that he had just rechecked Plaintiff that day (T. 356). He indicated that his conclusions remained consistent with his earlier opinion regarding Plaintiff's abilities (Tr. 356).  As of January 1993, Plaintiff began taking insulin for his diabetes (Tr. 454, 868).

William Houser, M.D., an internist with specialty in pulmonary and critical care medicine, testified at the hearing in July 2001 (Tr. 1000).  Dr. Houser testified that Plaintiff's main medical condition was diabetes mellitus (Tr. 1001).  He noted that Plaintiff had two

6

complications from this condition, one was peripheral neuropathy, especially involving the left lower extremity, and the other was diabetic retinopathy, which, according to Plaintiff, resulted in near blindness in one eye, but satisfactory vision in the other (Tr. 1001-02). Dr. Houser testified that sensations such an numbness and tingling, called dysesthesia, could be associated with peripheral neuropathy (Tr. 1008).  Dr. Houser also determined that Plaintiff had degenerative disk disease involving the lumbar spine (Tr. 1002). He indicated that this would mostly limit Plaintiff's lifting, and that standing and walking would not be significantly affected (Tr. 1007). The ALJ asked Dr. Houser whether there was anything in the record that would preclude the performance of light work, provided that there was no operation of foot controls, and the individual could avoid hazards, such as uneven or wet surfaces (Tr. 1002-03).  Dr. Houser responded, "No" (Tr. 1003).  However, Dr. Houser clarified his opinion that Plaintiff's degenerative disk disease would limit Plaintiff, but not as severely as stated by Plaintiff (Tr. 1004).

In January 1990, two objective personality tests were administered at the Veterans Administration to determine a diagnostic impression and for treatment purposes (Tr. 200).  The Minnesota Multiphasic Personality Inventory (MMPI) result was valid, but of a rare type (Tr. 200).  Plaintiff's score suggested that he had poor tolerance for stress (Tr. 200-01).  Other aspects of Plaintiff's MMPI profile suggested that he may be rebellious, nonconforming, and have a history of minor run-ins with the law or other behavior control problems (Tr. 201).  The Mellon Clinical Multiaxial Inventory (MCMI) was also administered, and it was found to be valid and was suggestive of a person of very severe psychopathology (Tr. 202).  It suggested a chronic and/or periodically severe pathology to the overall structure of his personality (Tr. 202).

Dr. Holly reported that together, these test results suggest severe psychopathology, and that the following diagnoses were potentially applicable: paranoid personality disorder, delusional disorder, and paranoid schizophrenia (Tr. 204).

On January 3, 1991, Plaintiff underwent a psychiatric consultation with Yasoda Modali, M.D. (Tr. 234-35). Plaintiff complained of having a hard time getting along with people, and he indicated that he had a bad temper all of his life (Tr. 234). Dr. Modali's impression was personality disorder, explosive type (Tr. 235). On March 19, 1991, Dr. May wrote a letter, based on his January 21, 1991 evaluation of Plaintiff (Tr. 252). He clarified that he believed that his January 1991 evaluation was valid (Tr. 252). At that time, he also reviewed Plaintiff's MMPI and MCMI results as well as the VA psychologist's diagnoses of paranoid personality disorder, delusional disorder, and paranoid schizophrenia (Tr. 253- 54). He concluded that Plaintiff was permanently and totally disabled from work and from the competitive labor market (Tr. 254). A consultative psychological examination performed on April 18, 1991, by Bruce Amble, Ph.D., is largely illegible (Tr. 256-58). On September 24, 1992, Dr. Amble performed another consultative examination of Plaintiff (Tr. 378-84). Dr. Ample reviewed, inter alia, Plaintiff's military and VA records, his evaluation of the client from April, and a psychiatric report from 1991 (Tr. 378). Plaintiff indicated that he was unable to handle pressures anymore, he had to walk away from situations (Tr. 379). Plaintiff was able to groom himself, he did a little housework and necessary yard work (Tr. 379). He assisted in meal preparation (Tr. 379). On MMPI testing, Plaintiff's score on the validity scale suggested confusion and/or symptom magnification (Tr. 380).

On the Beck Depression Inventory, there were serious questions of validity (Tr. 380). Dr.

8

Amble indicated that Plaintiff identified with personality disturbance, explosive and paranoid characteristics (Tr. 381). He showed major distortion on two personality assessment procedures, suggestive of symptom magnification (Tr. 381). Dr. Amble completed an assessment in which he reported that Plaintiff had severe limitations in his social interaction, sustained concentration, and adaption (Tr. 382-84).

On October 15, 1992, Samuel Jenny, Ph.D. performed a neuropsychological evaluation (Tr. 385-90, 397-402). He reported that a moderate amount of emotional maladjustment was present and sufficient to impact negatively on vocational functioning (Tr. 390). Dr. Jenney diagnosed delusional disorder not otherwise specified (temper impulse) with anxious and obsessive-compulsive features. He also assessed a Global Assessment of Functioning (GAF) score of 60 (Tr. 390, 402). He opined that Plaintiff was not suitably stable for any competitive employment until his personality disorder came under control (Tr. 390, 402).

Lisa Courtney testified as a Vocational Expert (VE) at the hearing in July 2001 (Tr. 1021). The ALJ asked the VE to assume a person of Plaintiff's age, education, and work experience, who had the physical ability to do light work and overhead lifting with the left extremity; who needed a setting without exposure to vibration, or hazards, such as uneven surfaces or wet surfaces; who was unable to operate foot controls; and who could not interact with the public, but could tolerate occasional interaction with co-workers and supervisors (Tr. 1025). The VE testified that such a person could work 5,600 light jobs and 3,900 sedentary jobs as night patrol, a surveillance monitor, an inspector, and as an assembler (Tr. 1026).

**DISCUSSION**

**The ALJ's Decision**

The Court begins its discussion of the ALJ's decision by noting that this case has a long history with a voluminous record. The ALJ held that, based upon Plaintiff's application that he filed on November 13, 1990, he was not entitled to a period of disability or DIB because he did not become disabled prior to June 30, 1993.[2] The ALJ further held that based on August 1, 1991 application, the Plaintiff was entitled to DIB on January 14, 1997 when he attained the age of 55 because the Grid directed that holding. The issue before this Court is whether the ALJ erred in its decision that the Plaintiff did not become disabled prior to June 30, 1993. In arriving at the decision that the Plaintiff was not disabled prior to his last insured date, the ALJ found that the evidence established that Plaintiff had severe diabetes mellitus with neuropathy and retinopathy, osteoarthritis of the left shoulder, bilateral knees, and right hand, degenerative disc disease, and personality disorder (Tr. 985). However, the Plaintiff's impairments or combination of impairments did not meet or equal any listed impairment (Tr. 985). Additionally, the ALJ found that Plaintiff retained the residual functional capacity (RFC) to perform a limited range of light exertional work. The ALJ found that Plaintiff could not perform his past relevant work, but that a significant number of jobs existed in the economy that Plaintiff could perform (Tr. 983-85).

**Legal Standard**

To receive disability benefits or supplemental security income, a claimant must be "disabled." A disabled person is one whose physical or mental impairments result from

---

[2] June 30, 1993 is the date his insured status lapsed.

anatomical, physiological, or psychological abnormalities which can be demonstrated by medically acceptable clinical and laboratory diagnostic techniques and which prevent the person from performing previous work and any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A), 1382c(a)(3)(B), 1382c(a)(3)(D).

The Social Security regulations provide for a five-step sequential inquiry that must be followed in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. The Commissioner must determine in sequence: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets or equals one listed by the Commissioner, (4) whether the claimant can perform his or her past work, and (5) whether the claimant is capable of performing any work in the national economy. Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000). If the claimant does not have a listed impairment but cannot perform his or her past work, the burden shifts to the Commissioner at Step 5 to show that the claimant can perform some other job. Id.

Under the Social Security Act, a court must sustain the Commissioner's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g) Substantial evidence is "more than a mere scintilla" of proof. The standard is satisfied by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); Butera v. Apfel, 173 F.3d 1049, 1055 (7th Cir. 1999). In addition, the ALJ must build a bridge of logic connecting the evidence to the conclusions that support the decision. Groves v. Apfel, 148 F.3d 809, 811 (7th Cir. 1998). Because the Commissioner is responsible for weighing the evidence, resolving conflicts in the evidence, and making independent findings

of fact, this Court may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner.  Id.  However, this Court does not defer to conclusions of law, and if the Commissioner makes an error of law or serious mistakes, reversal is required unless this Court is satisfied that no reasonable trier of fact could have come to a different conclusion.  Sarchet v. Chater, 78 F.3d 305, 309 (7th Cir. 1996).

**The ALJ's Decision Is Supported by Substantial Evidence**

The Plaintiff argues that the ALJ erred by not considering evidence that was favorable to him.  He argues that the ALJ had two physical capacity evaluations before her.  Plaintiff argues the first evaluation, completed on October 9, 1990, lists Plaintiff's physical functioning demand characteristic as light (Tr. 197) and a second evaluation, completed on January 21, 1991, lists his exertional demand level as sedentary (Tr. 241).  He argues that if he were limited to sedentary work he would have qualified for benefits at age 50 when he was still insured for DIB. 20 CFR Pt. 404 Subpt.P., App. 2 Rule 201.10.  He argues that the ALJ gave no explanation as to why the January 21st report was not considered  (Pl. Brief at 5).

The ALJ should consider and discuss all credible medical evidence that is supported by clinical findings and relevant to the question at hand.  Nelson v. Apfel, 131 F.2d 1228, 1237 (7th Cir. 1997).  An ALJ may not discuss only evidence that favors his conclusion, but rather must articulate, at some minimum level, his analysis of the evidence to allow a reviewer to trace his path of reasoning.  Diaz v. Chater, 55 F.3d 300, 309 (7th Cir. 1995).  At the same time, the weight to be given to a particular piece of evidence is within the ALJ's discretion, and the ALJ is not required to discuss every piece of evidence in the record.  Id.

Plaintiff is correct that in the ALJ's evaluation of the evidence, he gave considerable

12

weight to the physical capacity evaluation dated October 9, 1990. This evaluation limited Plaintiff to a "performance of a limited range of light exertional work" (Tr. 978). The ALJ found that report to be supported by objective findings and gave it considerable weight.

Additionally, the ALJ looked to other sources to support his decision regarding Plaintiff's physical function capacity. The ALJ relied upon the reports of the Plaintiff's treating orthopedist, the prior medical expert, and the current medical expert to support a residual functional capacity of limited range of light work.

Although the ALJ did not expressly discuss the findings from the second Worklab evaluation, she relied in large part on the testimony of Dr. Houser, a medical expert, who reviewed the record evidence, presumably including both the Worklab evaluations (Tr. 1002). Indeed, the ALJ referred to the January 1991 Worklab evaluation while questioning Dr. Houser (Tr. 1008). In response to a question posed by the ALJ about various limitations, Dr. Houser opined that there was nothing in the record which would preclude the performance of light work, provided that there was no operation of foot controls, and the individual could avoid hazards, such as uneven or wet surfaces (Tr. 1002-03). Therefore, although the ALJ did not expressly discuss the later Worklab evaluation, she considered the testimony of Dr. Houser, who had reviewed the record. See Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) ("[T]he ALJ adopted the limitations suggested by the specialists and reviewing doctors, who were aware of Skarbek's obesity. Thus, although the ALJ did not explicitly consider Skarbek's obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions."); see also Sims v. Barnhart, 309 F.3d 424, 429 (7th Cir. 2002) ("The ALJ's failure to address these specific findings, however, does not render his decision unsupported by substantial evidence because an

ALJ need not address every piece of evidence in his decision. The ALJ need only build a bridge from the evidence to his conclusion.") (citations and internal quotation omitted).

In addition, the ALJ discounted Dr. Froehling's opinion that Plaintiff could lift only 10 to 15 pounds (Tr. 247-48, 350) because she did not find that the objective evidence supported his opinion (Tr. 983). The ALJ considered that a myelogram from June 1990 showed only evidence of mild degenerative joint disease and minimal bulging at L4 and L-5 (Tr. 983, 178, 187). The ALJ also considered that, in November 1994, Dr. Adelmann, a consultative neurologist, completed an assessment in which he reported that Plaintiff could lift 25 to 30 pounds (Tr. 874, 980). Dr. Adelmann also opined that Plaintiff could lift and carry up to 20 pounds continuously and up to 50 pounds occasionally, sit for eight hours, stand for six hours, and walk for six hours (Tr. 876). Thus, regardless of the limitations presented in the two Worklab reports and by Plaintiff's treating physician, the ALJ provided support for Plaintiff's physical RFC finding.

Next, Plaintiff argues that the ALJ improperly interpreted the evidence before her. He points to the October 1990 Worklab evaluation for the proposition that the ALJ found that the Plaintiff was unmotivated to return to any work, when in fact, the examiner actually wrote that Plaintiff appeared unmotivated to return to his "prior" employment (Tr. 193). Although the ALJ may have misinterpreted the statement, such was only one factor considered by the ALJ in assessing Plaintiff's credibility as to the effects of his condition. Indeed, as the ALJ stated, she determined that Plaintiff's allegations of complete debility were not credible in light of the objective medical evidence as well as the evidence from the medical sources, as just discussed above (Tr. 978).

Plaintiff also points out that the ALJ cited to the results of Mr. Stock's MMPI testing as

suggesting malingering (Pl. Br. at 6, referring to Tr. 885, 981). Plaintiff claims, however, that Mr. Stock's results actually suggested either malingering, an exaggeration of difficulties, resistence to testing, or significant levels of pathology (Pl. Br. at 6, referring to Tr. 885). Plaintiff also points out that the VA conducted MMPI testing, and it concluded that the results suggested severe psychopathology. (Pl. Br. at 7, referring to Tr. 202). Plaintiff argues that the ALJ failed to discuss the weight she gave to the VA's conclusion, but rather, just stated that it was strange that two months later an entirely different profile would emerge, referring to an MMPI performed by Worklab, in order to discredit the VA's testing conclusion (Pl. Br. at 7).

  The Worklab report indicated that an MMPI-2 test was conducted, and it determined that Plaintiff did not suffer from any psycho-social stressors (Tr. 193). Plaintiff argues that the Worklab report did not provide any scales suggesting that it was valid, and that without such, there was no basis to discredit the VA's MMPI testing results (Pl. Br. at 7). Based on this, Plaintiff argues that the ALJ erred in finding only that Mr. Stock's MMPI testing suggested malingering (Pl. Br. at 7). Although the MMPI tests referred to by Plaintiff may have suggested a more severe mental condition, the ALJ did expressly discuss that another MMPI was administered by Dr. Amble in September 1992 (Tr. 378-84, 980). Dr. Amble reviewed, inter alia, Plaintiff's military and VA records, a report from Dr. Modali from January 1991, and his own evaluation of the client from April 1992 (Tr. 378). On MMPI testing, the validity scale was indicative of significant attenuation on the clinical scales, often suggestive of confusion and/or symptom magnification (Tr. 380). On the Beck Depression Inventory testing, there were serious questions of validity (Tr. 380). Dr. Amble indicated that Plaintiff showed major distortion on two personality assessment procedures, suggestive of symptom magnification (Tr. 381). Thus,

15

the ALJ could reasonably conclude that the findings of Worklab and Dr. Amble were more consistent with a finding by Dr. Stock that Plaintiff was malingering. Furthermore, the ALJ did not find that Plaintiff had a severe malingering disorder, but in fact, did find that Plaintiff had a severe personality disorder (Tr. 982-83). Thus, the ALJ did not completely disregard Plaintiff's complaints of a mental condition, but only determined that they were not as severe as suggested by Plaintiff. The ALJ's credibility finding is entitled to substantial deference and should not be disturbed unless patently wrong. See Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

**The ALJ Properly Discounted Plaintiff's Neuropathic Pain**

Plaintiff argues that the ALJ improperly discounted his neuropathic pain (Pl. Br. at 7-8). Plaintiff refers to the ME's testimony that dysesthesia, an abnormal sensation on the skin such as burning or cutting pain, is associated with diabetic neuropathy and a statement from the Merck Manual of Diagnostic and Therapy that diabetic neuropathy can be associated with debilitating, deep-seated pain (Pl. Br. at 7-8). Based on such, Plaintiff claims that he produced uncontroverted evidence that he had an impairment that could reasonably be expected to produce the disabling pain he alleged (Pl. Br. 7-8, referring to Tr. 1008). Although it is true that Dr. Houser indicated that Plaintiff had diabetic neuropathy, he did not testify that Plaintiff's diabetic neuropathy would result in any further limitations than those indicated by the ALJ (Tr. 1001-03). See Anderson v. Sullivan, 925 F.2d 220, 222 (7th Cir. 1991)(mere diagnosis of nervousness did not prove disability); see also Schmidt v. Barnhart, No. 04-1433, slip op. at 14 (7th Cir. January 14, 2005)("Even assuming the accuracy of Schmidt's unsupported contention that some persons with IBS may experience fatigue, this does not mean that Schmidt suffers this symptom"). Plaintiff also argues that Dr. Houser indicated that degenerative disc disease would limit

Plaintiff's lifting. Again, however, Dr. Houser did not testify to any additional limitations beyond a range of light work (Tr. 1002-03, 1007). Also, Dr. Adelmann, who recognized Plaintiff's diabetic neuropathy, did not report any functional limitations due to neuropathy, beyond the range of light work found by the ALJ (See Tr. 874-76). Therefore, the ALJ's decision was supported by the record.

**The ALJ Properly Dismissed the Opinion of Psychologist Barbara Jensen**

Finally, Plaintiff argues that the ALJ improperly dismissed the opinion of the medical expert. Plaintiff does not challenge the ALJ's determination that, if the RFC of a range of light work is proper, a significant number of jobs existed that Plaintiff could perform given his vocational background. Therefore, he has waived that issue.

Dr. Jessen opined that Plaintiff met Listing 12.08, based on his personality disorder, and because he had marked restrictions of activities of daily living and marked difficulties in maintaining social functioning (Tr. 1016). See 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.08A, B. The ALJ accepted that Plaintiff had a severe personality disorder, but that the disorder did not meet the relevant listing criteria of § 12.08 (Tr. 982). The ALJ found that Plaintiff was only moderately limited in his activities of daily living, markedly limited in his social functioning, and had mildly limited in concentration persistence and pace (Tr. 982). In support of this, the ALJ considered that, although Plaintiff reported concerns of hurting someone, he had never been in trouble with the police for harming anyone, he had never harmed his girlfriend, and he was able to tolerate being around his girlfriend's demented mother (Tr. 386, 921, 924, 982). In addition, although not specifically discussed by the ALJ, according to the report from Dr. Amble, Plaintiff was able to groom himself, he did a little housework and yard work, and he

assisted in meal preparation (Tr. 379). Plaintiff's ability to maintain a relationship with his girlfriend, as well as his ability to perform some level of activities, suggests that he was not "markedly" limited in his daily activities. The ALJ also discounted Dr. Jessen's opinion that Plaintiff met Listing 12.08, because the ALJ did not believe that there was any evidence that Plaintiff was reporting psychotic symptoms in February 1996, and Dr. Jessen was relying on that to find that Plaintiff met Listing 12.08 (Tr. 982). In addition, the ALJ concluded that Dr. Jessen based her opinion largely on Plaintiff's self reports (Tr. 982). Therefore, the ALJ articulated a basis for discrediting Dr. Jessen.

## CONCLUSION

For the reasons stated above, the Commissioner's final decision denying Lionel Hathaway's application for Disability Benefits and Supplemental Security Income is **AFFIRMED** and Judgment is **GRANTED** in favor of the Defendant and against the Plaintiff. The case is **DISMISSED** with prejudice.

**DATED: September 29, 2006**

*s/ Donald G. Wilkerson*
**DONALD G. WILKERSON**
**United States Magistrate Judge**
